**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

JANE DOE,
*Plaintiff*

v. C.A. No. 1:25-cv-00311-MSM-PAS

BROWN UNIVERSITY, et al.,
*Defendants* *Jury Trial Demanded*

**REDACTED PUBLIC AMENDED COMPLAINT**

## I. INTRODUCTION

This action is brought by Plaintiff Jane Doe ("Plaintiff"), proceeding under pseudonym pursuant to this Court's authorization (ECF No. 12), against her former employer and its affiliated institutions, seeking compensatory, punitive and liquidated damages, together with attorneys' fees, litigation expenses, costs and equitable relief, arising out of Defendants' violations of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 et seq.; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; the False Claims Act anti-retaliation provision, 31 U.S.C. § 3730(h); the Rhode Island Fair Employment Practices Act ("FEPA"), R.I. Gen. Laws § 28-5-1 et seq.; R.I. Gen. Laws § 42-87-1 et seq.; the Rhode Island Civil Rights Act of 1990 ("RICRA"), R.I. Gen. Laws § 42-112-1 et seq.; and the Rhode Island Whistleblowers' Protection Act ("RIWPA"), R.I. Gen. Laws § 28-50-1 et seq.

## II. PARTIES

1. Plaintiff was employed by Defendant Brown University as a Program Coordinator in its Department of Psychiatry and Human Behavior from January 2023 until her termination effective October 2024.
2. Plaintiff proceeds under pseudonym pursuant to this Court's order at ECF No. 12.
3. Defendant Brown University ("Brown") is a domestic non-profit corporation organized under the laws of the State of Rhode Island with a principal place of business at 1 Prospect Street, Providence, Rhode Island 02912.
4. Defendant Lifespan Corporation, now known as Brown University Health ("Lifespan"), is a Rhode Island health system and a recipient of federal financial assistance.
5. Defendant Care New England Health System ("CNE") is a Rhode Island health system and a recipient of federal financial assistance.
6. At all relevant times, Brown and CNE jointly operated the Memory and Aging Program ("MAP"), a research program funded in part through National Institutes of Health ("NIH") grant R01AG062268.
7. At all relevant times, Dr. Edward Huey was the Director of MAP and held dual appointments as a Brown and Care New England employee. Dr. Huey previously supervised Plaintiff at Columbia University Medical Center.

8. At all relevant times, Colin Stein was a Brown employee who served as Plaintiff's direct supervisor from approximately 2023 until May 2024.
9. At all relevant times, Masood Manoochehri was a Brown employee, a Senior Research Associate in the Department of Psychiatry and Human Behavior, who served as Plaintiff's interim supervisor from approximately May 2024 through the end of her employment.
10. At all relevant times, William "Bill" Menard was a CNE employee who served as Operations Manager for MAP and exercised operational authority over MAP staffing, including Plaintiff's role responsibilities.
11. At all relevant times, Margaret "Maggie" Malloy was a Lifespan employee who performed work on the Brown-administered NAPS study.
12. At all relevant times, Debi Horvath was Brown's Assistant Director of Leave and Accommodation Services.

## III. JURISDICTION & VENUE

13. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts claims arising under federal law, specifically the ADA, the Rehabilitation Act, Title VII, and the False Claims Act.
14. Supplemental jurisdiction over the state law claims set forth herein is predicated on 28 U.S.C. § 1367, as they arise out of the same case or controversy.
15. Venue is proper in this District under 28 U.S.C. § 1391(b) insofar as Defendants conduct substantial business in Rhode Island and are therefore deemed to reside in this District, and a substantial part of the acts and omissions giving rise to the claims asserted herein occurred in this District.
16. Plaintiff has timely filed a charge of discrimination with the Equal Employment Opportunity
17. Commission ("EEOC") and has received a right-to-sue letter, dated July 25, 2025.

## IV. MATERIAL FACTS

Factual Background

18. Prior to her employment with Brown, Plaintiff was employed as a research coordinator at Columbia University Medical Center from 2019 through 2022.
19. At Columbia, Plaintiff worked under the direct supervision of Dr. Edward Huey.
20. At Columbia, Plaintiff's duties included participant coordination, protocol development, regulatory submissions, biological sample logistics, and management of workflows for complex NIH-funded studies.
21. Plaintiff received consistently positive performance evaluations throughout her Columbia employment and navigated changing research landscapes systematically and diligently.
22. On December 21, 2022, Brown extended Plaintiff a written offer of employment for the position of Project Coordinator in the Department of Psychiatry and Human Behavior.
23. The December 21, 2022 offer letter expressly stated that Plaintiff would be "reporting to Dr. Edward Huey" and stated funding for this position is expected to continue at least through one year from your start date”
24. On January 17, 2023, Brown issued a revised offer letter correcting a typographical error.

25. The revised offer letter repeated: "You will be reporting to Dr. Edward Huey at Butler Hospital - Weld Building," and stated “Funding for this position is expected to continue at least through three years from your start date.”
26. Both offer letters stated that Plaintiff would be reporting to Dr. Huey.
27. Butler Hospital is a facility of Defendant Care New England.
28. Brown's written offer of employment therefore assigned Plaintiff to work at a Care New England facility, under the supervision of an individual holding appointments at both institutions.
29. Neither offer letter mentioned Colin Stein.
30. Neither offer letter disclosed that Plaintiff would report to anyone other than Dr. Huey.
31. In reliance on the reporting structure stated in both offer letters, Plaintiff accepted Brown's offer and declined other opportunities.
32. In reliance on that reporting structure, Plaintiff terminated her four-year employment at Columbia.
33. In reliance on that reporting structure, Plaintiff relocated from New York City to Rhode Island, signed a lease, and established residency in Providence.
34. Brown employed Plaintiff from January 2023 until it terminated her employment September 2024, effective October 2024.
35. Plaintiff's position was funded through NIH R01 grant R01AG062268.
36. That grant remained active through May 31, 2025.

*Plaintiff's Disabilities and Defendants' Knowledge*

37. At all relevant times, Plaintiff suffered from impairments that qualify as disabilities under the ADA, the Rehabilitation Act, FEPA, and RICRA.
38. On June 8, 2022, Plaintiff underwent comprehensive neuropsychological testing conducted by Victoria Rivamonte, Psy.D., a licensed Clinical Psychologist and Neuropsychologist.
39. Dr. Rivamonte diagnosed Plaintiff with Attention-Deficit/Hyperactivity Disorder, Predominantly Inattentive Presentation (ICD-10 F90.0).
40. Plaintiff disclosed her ADHD diagnosis to Dr. Huey prior to her relocation to Rhode Island.
41. Plaintiff also has diagnosed chronic conditions requiring ongoing treatment, specifically hidradenitis suppurativa, a chronic inflammatory condition, and Hashimoto's Thyroiditis, an autoimmune condition.
42. Plaintiff disclosed both conditions to Dr. Huey during her first year of employment.
43. On or about April 25, 2024, Plaintiff was diagnosed with Post-Traumatic Stress Disorder ("PTSD") by a licensed mental health provider in Rhode Island.
44. That diagnosis was subsequently confirmed by AthenaPsych and the Mount Sinai Hospital Department of Psychiatry, in psychiatric evaluations dated November 26, 2025 and December 31, 2025.
45. Providers confirmed Plaintiff's diagnoses as PTSD, chronic; Panic Disorder with episodes of dissociation; Obsessive-Compulsive Disorder; and ADHD.

*Plaintiff's Physical Impairments*

46. Hidradenitis suppurativa is a chronic, immune-mediated inflammatory condition of the skin. It produces chronic lesions that recur in exacerbations, commonly called flares.
47. Those lesions arise, and persist, notwithstanding adherence to prescribed medical treatment. Plaintiff's adherence to her treatment regimen did not prevent their recurrence.
48. The lesions are painful. They arise most characteristically in the axillae and the inguinal region, and may arise elsewhere on the body, including the upper and lower extremities.
49. Lesions at those sites limit reaching and lifting with the affected arm, limit standing and walking, and make prolonged sitting painful.
50. Because exacerbations recur without a fixed pattern, Plaintiff could not predict in advance on which days she would be limited, or to what degree.
51. Hashimoto's Thyroiditis is an autoimmune condition affecting thyroid and endocrine function.
52. Under 42 U.S.C. § 12102(2)(B), a major life activity "also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions."
53. Plaintiff's hidradenitis suppurativa substantially limits the operation of her immune system and normal cell growth. Plaintiff's Hashimoto's Thyroiditis substantially limits her endocrine function. Each is therefore a disability within the meaning of the ADA, the Rehabilitation Act, FEPA, and RICRA.
54. Under 42 U.S.C. § 12102(4)(D), "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." Plaintiff's conditions are episodic in character, producing exacerbations that are unpredictable in timing and that substantially limit her when active.
55. Under 42 U.S.C. § 12102(4)(E), whether an impairment substantially limits a major life activity is determined without regard to the ameliorative effects of mitigating measures, including medication.
56. Physiological and psychological stress is a recognized exacerbating factor for hidradenitis suppurativa. Heat, perspiration, friction and prolonged sitting are likewise recognized triggers of exacerbation.
57. Defendants required Plaintiff to be on site four days per week in a shared office, seated for extended periods, notwithstanding that Plaintiff had asked the accommodation team to reduce her on-site expectation in May and July and to permit her to work in alternative locations.
58. The accommodations Plaintiff requested that addressed her physical environment, including a desk or workstation fan, the option to use alternative workspaces, the option to work outdoors, and the option to leave the Butler campus and complete tasks off site, responded to physical triggers of exacerbation as well as to sensory ones.
59. During the period of escalating scrutiny and hostility alleged in this Complaint, Plaintiff experienced increased frequency and increased severity of exacerbations of her hidradenitis suppurativa.
60. Among the accommodations recorded in Brown's July 2024 documentation were autonomy over work patterns and the option to take days off in lieu "to accommodate spontaneous recovery needs," and to "allow recovery days after periods of high stress or demands or big deadlines."

61. Those provisions addressed, by their own terms, Plaintiff's need to recover following periods of elevated stress. Defendants' conduct produced sustained elevated stress while the flexibility those provisions contemplated was withdrawn or made impracticable to use.
62. The exacerbation of Plaintiff's physical conditions is a separate and additional harm caused by the conduct alleged in this Complaint.
63. Plaintiff's physical conditions also interact with and exacerbate her psychiatric conditions, intensifying physical stress responses, increasing vulnerability to panic episodes, prolonging recovery, and worsening fatigue, digestive difficulty, headache and nausea during periods of stress.
64. Because exacerbations of Plaintiff's physical conditions arise without warning, the accommodations Plaintiff requested, including flexibility in her working location, the ability to leave the Butler campus and complete tasks off site, and the option of alternative workspaces, addressed her physical impairments as well as her neurodivergent needs.
65. Defendants' requirement that requests to work remotely be submitted a week in advance was incompatible with an impairment whose exacerbations cannot be anticipated a week ahead.
66. Plaintiff's subsequent inability to work arose after, and as a result of, the conduct alleged herein. Throughout her employment, and at all times when Defendants were obligated to accommodate her, Plaintiff was able to perform the essential functions of her position with reasonable accommodation.
67. Plaintiff's disabilities substantially limit one or more major life activities, including concentrating, thinking, communicating, speaking, sleeping, interacting with others, and working.
68. The June 2022 neuropsychological evaluation documented below-average performance in auditory attention, auditory concentration, sequencing, psychomotor processing speed, and phonemic verbal fluency.
69. That evaluation further documented that Plaintiff's response inhibition fell within the Impaired range, at a level below that of the great majority of the adult population.
70. Response inhibition is the executive function that permits a person to pause, regulate an automatic reaction, and produce a considered response. Plaintiff's impairment in this domain bears directly on her capacity to respond to the unannounced and confrontational interactions alleged below.
71. On the Conners' Adult ADHD Rating Scale, Plaintiff's DSM-IV Inattentive Symptoms score was classified "Markedly Atypical."
72. Clinicians documented that Plaintiff experiences "stress-induced mutism" and an "inability to verbally express needs under pressure."
73. Provider documented that Plaintiff experiences "dissociation during evaluative or adversarial situations" and "panic episodes triggered by perceived scrutiny or authority figures."
74. Defendants were aware of Plaintiff's disabilities at all relevant times through direct disclosures, medical documentation submitted to Broadspire, Brown's third-party accommodation administrator, formal accommodation requests, and communications with Brown's Human Resources and Leave and Accommodation offices.
75. During her employment Plaintiff disclosed to Dr. Huey that she is neurodivergent and that she required accommodations related to that condition.

76. In Brown's own July 2024 accommodation follow-up documentation, Plaintiff described, and requested accommodations for, difficulty with sensory input and sensory overload; difficulty interpreting social cues and unwritten workplace rules; intolerance of uncertainty producing high levels of anxiety; demand avoidance; and a need for advance information, clear expectations and structured communication.
77. Defendants therefore had notice during Plaintiff's employment of her neurodivergence and of her related need for accommodation.
78. In addition and in the alternative, Defendants had a record of Plaintiff's impairments, as that term is defined under the ADA, FEPA, and RICRA.
79. In addition and in the alternative, Defendants regarded and perceived Plaintiff as having an impairment, as that phrase is defined under the ADA, FEPA, and RICRA.

**Plaintiff Was Qualified for Her Position**

80. Plaintiff holds a Bachelor's degree in Psychology and Spanish from Skidmore College (2018).
81. At the time of her hire, Plaintiff had approximately four years of NIH-funded research coordination experience.
82. Brown's own Staff Job Description for Plaintiff's position, prepared in November 2022, listed as minimum qualifications a "Bachelor's Degree in Neuroscience, Psychology, or related field and 3-5 years of previous research experience or equivalent combination of education and experience."
83. Plaintiff exceeded those stated minimum qualifications at the time of hire.
84. Beginning in January 2023, within weeks of her hire, Plaintiff coordinated the negotiation and execution of multi-institutional agreements governing the transfer of federally funded research materials and data arising from Dr. Huey's research program.
85. That work required Plaintiff to correspond directly with Columbia University Irving Medical Center's Sponsored Projects Administration, including its Manager of Contract Negotiations; with Brown's Office of Research Agreements and Contracting; and with Butler Hospital's Contract Office at Care New England.
86. That work concerned Material Transfer Agreements, Data Use Agreements and Release and Transfer Agreements involving the National Institutes of Health, Northwestern University, Adelphi University and McGill University.
87. On January 31, 2023, Plaintiff wrote to Columbia's Sponsored Projects Administration to obtain the status of four pending agreements, to identify an unresolved question regarding which institution should receive federally funded biosamples, and to propose a meeting of all concerned parties.
88. On February 8, 2023, Plaintiff identified that a Material Transfer Agreement had been executed with Brown rather than with Butler Hospital, and asked Columbia whether an additional agreement would be required to release the samples to Butler.
89. The agreements Plaintiff coordinated were ultimately executed in March and April 2023 by the National Institute on Aging, the National Institute of Neurological Disorders and Stroke, Brown's Director of Research Agreements and Contracting, and Butler Hospital's Vice President of Finance. See Exhibits J through M, infra.

90. Plaintiff performed this work within the first four months of her employment and without any performance criticism from Defendants.
91. At all relevant times Plaintiff was able to and in fact did perform the duties of her position, which establishes her ability to perform the essential functions of her job with or without reasonable accommodation.
92. Contemporaneous Huey Lab meeting notes dated March 13, 2024, created during a period in which Plaintiff was on approved medical leave and without Plaintiff's participation or knowledge, independently record Plaintiff's qualifications in the lab's own records.
93. Under the heading "Other concrete lab needs," those notes state that Plaintiff was "trained at CUIMC" for MRI supervision, "trained and finds fulfilling" with respect to SCID administration, and "trained" for BCBI one-hour visits.
94. Because those notes were generated by lab management, during Plaintiff's medical leave, and without her input, they corroborate Plaintiff's qualification to perform the essential functions of her position independent of Plaintiff's own account.
    a. *EXHIBIT A. Huey Lab Meeting + Discussion notes, March 13, 2024*

Mar 13, 2024| Huey Lab - Meeting + Discussion

Attendees:
Edward Huey
Masood Manoochehri
Colin Stein
Margaret Malloy
[redacted]

**AGENDA**

- Lab admin
  - Asana
    - Template cards for visits
    - Comments on Asana cards
    - Asana Starter for team pitch to Ted
  - Use of Huey Lab calendar for study visits - ALLFTD, BCBI, others will pick up
    - Send invites to Huey Lab calendar
  - Use of identifiers Asana and Google calendar - First Name, Last initial only
- Mind-Brain Research Day register by Thursday, 3/14 to attend Thursday, 3/28
- Staffing discussion
  - Maggie release from weekly meetings OK?
  - Timeline confirmed via email w/ Bill:
    - CADASIL plans ramp up in May 2024 with follow-up visits + baseline visits
    - BFB plans ramp up in early summer 2024 with additional baseline visits
    - NAPS / Huey lab plans ramp up with several additional studies in April/May 2024
    - Maggie will continue to work with all 3 groups in March/April. Starting in May, she will transition her time away from Huey Lab and more into CADASIL/BFB. Starting in late April / May, she may be asked to help train new RAs who might need to take on the MRIs for the Huey lab.
  - Other concrete lab needs
    - MRI scheduling (5-6 per month)
    - MRI supervision (5-6 per month)
      - [redacted] trained at CUIMC
    - SCIDs (JP, Alyssa (parental leave Aug 2024))
      - [redacted] trained and finds fulfilling
    - BCBI 1-hour visit
      - [redacted] trained; Claudine also willing to do task
      - Task could be done in room at MRF before the scan
    - JP: recruitment/visit data collection as a long-term option
- Other status updates
  - ALLFTD IRB status

95. Plaintiff's work included reconciling diagnostic research records across two institutions. On June 20, 2024, Plaintiff sent Mr. Manoochehri a written status report on the NAPS SCID data clean-up effort, reporting the verification status of nine active Brown records through the NetSCID and

REDCap systems, including diagnosis entry and ICD coding, and identifying approximately nineteen legacy records transferred from Columbia that were incomplete or missing SCID documentation.

96. In the same communication Plaintiff reported that she had created a SCID Overview Report, an instrument of her own design that consolidated previously collected participant data so that SCID raters could confirm diagnostic accuracy without asking participants the same demographic and medical history questions twice.

97. Accommodation staff and plaintiff proposed that the lab adopt an automated note-taking tool Supernormal.ai to improve record keeping for herself and her supervisor

98. Plaintiff opened that communication by reporting that she had begun her work day remotely in order to compile notes before a 10:00 a.m. virtual team meeting and would come to the office immediately after it ended, and explained that she was following up in writing because her "thoughts were a bit scattered" at the preceding verbal meeting.

99. That communication reflects Plaintiff both reporting her whereabouts to her supervisor without being asked and independently employing the written-follow-up accommodation she had requested on May 6, 2024.

100. In Brown's own July 2024 accommodation documentation, Plaintiff recorded that she had met all participant visits, that she had reviewed the relevant policies and procedures, that she had communicated and reviewed procedures directly with the MRI center and its administration, that she had followed up on earlier misunderstandings, and that she had been on time without issue since her questions were addressed.

101. That contemporaneous record is inconsistent with Defendants' subsequent characterization of Plaintiff's performance, and with their reliance on an earlier incident involving MRI procedures as a basis for escalating scrutiny of her.

102. At all relevant times Plaintiff was a qualified individual with a disability, as that term is defined under the ADA, the Rehabilitation Act, FEPA, and RICRA.

*The Lab's Established Practice for Medical Appointments*

103. Plaintiff's ADHD required monthly prescription renewal visits, as required by law.

104. Plaintiff's hidradenitis suppurativa required follow-up appointments ranging from monthly to biannual, depending on treatment needs.

105. Plaintiff's Hashimoto's Thyroiditis required annual to biannual follow-up appointments.

106. It was a common and established practice within the Huey Lab for staff to leave the office for medical appointments and make up the missed hours at another time, adjust their working hours accordingly, or use time in lieu.

107. "Time in lieu" meant that hours worked beyond an employee's regular shift, for example staying late to meet a study deadline or to conduct early morning, evening, or weekend participant interviews, were credited to the employee and could later be used to offset time away from the office.

108. Coordinator A, Coordinator C and Mr. Manoochehri each followed this practice without incident and without management scrutiny.

109. On at least two occasions, Mr. Manoochehri worked remotely from an off-site location, specifically a car dealership, when a vehicle breakdown required it, without incident or management scrutiny.

110. Dr. Huey was aware of and accommodated Plaintiff's need to leave the office for these appointments throughout the period in which he supervised her.

111. Plaintiff generally attempted to schedule medical appointments outside working hours where possible, but her treating providers' clinics frequently lacked evening availability.

*First Discriminatory and Retaliatory Act — Undisclosed Reassignment of Supervision*

112. In or about March-April 2023, Brown placed Plaintiff, Coordinator A and Coordinator C under the direct supervision of Colin Stein.

113. This reporting structure had not been disclosed to Plaintiff as a condition of her employment or during her hiring discussions.

114. This reporting structure had not been disclosed to Coordinator A or Coordinator C either.

115. The formal reporting structure reflecting this change was not communicated until months after Mr. Stein had, in practice, already assumed supervisory authority.

116. Plaintiff, Coordinator A and Coordinator C attempted to resolve the discrepancy internally within the lab group before escalating the matter.

117. In doing so they raised concerns that Mr. Stein's unannounced placement as direct manager appeared designed, at least in part, to justify an increase in his own compensation.

118. When Plaintiff inquired with Human Resources about the discrepancy between her offer letters and her actual reporting structure, Mr. Stein convened an emergency meeting in Spring 2024.

119. During that meeting, Mr. Stein stated that discussions about his assumption of the Project Manager position had occurred "since before offer letters went out, in Fall of 2022."

120. Mr. Stein's statement establishes that Brown knew, at the time it issued both offer letters, that the reporting structure those letters described was not the structure Brown intended to implement.

121. Plaintiff would not have relocated and left her employment at Columbia had she known that the collaborative supervisory approach on which she relied would be replaced without notice.

122. Mr. Stein's supervisory approach, which included micromanagement and direct scrutiny not applied to other lab members, proved incompatible with Plaintiff's documented disability-related need for predictable, structured supervision and advance notice of changes.

*Second Discriminatory and Retaliatory Act — Harassment Regarding Medically Necessary Appointments*

123. On November 24, 2023, Plaintiff was involved in a rear-end motor vehicle accident.

124. The accident required Plaintiff to attend additional medical appointments beyond her routine visits for caring for her health and wellness.

125. Plaintiff continued to follow the lab's established practice described above for these appointments.

126. Mr. Stein repeatedly questioned and criticized Plaintiff's Workday time-off requests for these medically necessary appointments.

127. Mr. Stein threatened to escalate the matter to Dr. Huey, stating that he would "tell Ted," if Plaintiff continued to request time for these appointments.

128. Dr. Huey had always been aware of, and had accommodated, Plaintiff's need to leave the office for these appointments.

129. The same flexibility went unquestioned when used by Coordinator A, Coordinator C and Mr. Manoochehri.

130. Plaintiff's underlying medical need for these appointments did not change when Mr. Stein assumed direct supervision of her.

131. What changed was Mr. Stein's treatment of an accommodation practice that Dr. Huey and the lab generally had previously permitted without incident, both for Plaintiff and for her non-disabled colleagues.

132. Plaintiff's objection was therefore not to a change in supervisory style in the abstract, but to the withdrawal, under a new supervisor, of an accommodation tied to a specific, disclosed and unchanging medical need.

*Third Discriminatory and Retaliatory Act — The Off-the-Books Staffing Arrangement and Plaintiff's Reports*

133. Margaret Malloy was at all relevant times a Lifespan employee.

134. Ms. Malloy was not named as personnel on NIH grant R01AG062268.

135. Mr. Menard interviewed Ms. Malloy for a role within the Memory & Aging Program.

136. Mr. Menard, in coordination with Lifespan and with Mr. Stein and Dr. Huey, arranged for Ms. Malloy to perform work mirroring Plaintiff's duties on the Brown-administered NAPS study.

137. Ms. Malloy performed that work at a lower rate of pay than Plaintiff.

138. That arrangement did not follow Brown's required onboarding procedures, NIH grant management requirements for effort reporting, petty cash disbursement, or IRB personnel protocols.

139. Mr. Stein instructed Plaintiff to integrate Ms. Malloy into IRB personnel lists and to coordinate her participation in the NIH-funded study.

140. Because Ms. Malloy was not an authorized grant recipient, she could not lawfully hold her own petty cash account to compensate study participants.

141. Prior to March 2024, Plaintiff, Coordinator C and Coordinator A raised questions to management regarding why Ms. Malloy could not obtain her own authorized petty cash account, notwithstanding her regular participation in study procedures requiring participant compensation.

142. Those questions were not addressed at that time.

143. In March 2024, while setting up her own authorized petty cash account for participant compensation, Plaintiff discovered that Research Assistants properly authorized to hold petty cash accounts on the grant, including Plaintiff, were being required to share or route their own

designated petty cash funds to cover participant compensation for post-MRI procedures handled on site by Ms. Malloy.

144. Mr. Stein and Mr. Menard had directed and facilitated that arrangement.

145. In March 2024, Plaintiff reported the arrangement to Jana, Brown's finance officer responsible for ensuring compliance with federal grant-charge requirements, including participant compensation and the proper authorization of personnel holding petty cash accounts.

146. Plaintiff reasonably believed, and continues to believe, that the arrangement she reported concealed from Brown's own compliance officer the true recipient and use of federal grant funds disbursed for participant compensation.

147. Plaintiff separately and directly opposed the arrangement to Mr. Stein and to Mr. Menard.

148. Plaintiff refused to continue sharing her own petty cash funds.

149. Plaintiff objected to complying with unannounced rules governing the arrangement and questioned why such rules were being applied to her differently than to other similarly situated employees.

150. Plaintiff's direct opposition to Mr. Stein and Mr. Menard constituted protected activity distinct from, and in addition to, her report to Brown's finance office.

151. Contemporaneous Huey Lab coordinators meeting notes dated March 4, 2024 record, among Dr. Huey's updates to the team, that "Maggie to be phased out of assisting with NAPS over the coming weeks."

a. EXHIBIT B. Huey Lab Coordinators + Ted Meeting notes, March 4, 2024.

Mar 4, 2024 | Huey Lab - Coordinators + Ted Meeting

Attendees: [redacted] Colin Stein Edward Huey Huey, Edward D Malloy, Margaret Masood Manoochehri [redacted]

**Notes**

- Action items for Ted:
  - Genetics
    - Create slide for previously published paper to be included in the EAB deck
  - FOXY
    - Results meeting Wednesday.
  - NBRS Paper
    - Masood forwarded paper to Ted.
  - ADRC Meeting
    - John is attempting to connect Ted with Vince Mor.
  - Biofinder
    - Ted to write up changes and plan for altering the protocol to be more aligned with ADRC.
- Ted updates for team:
  - ADRC/Biofinder
    - Met with Steve Salloway about Biofinder and involving it with the ADRC application. Proposing to alter the project to more closely align with the ADRC.
    - Inclusion criteria may change to include more participants from clinical studies who do not have normal cognition.
    - Companies originally involved with the protocol will need to weigh in on the changes to the project.
    - Hwamee to be less involved in the project, ideally would involve Luke more in the project down the road. ADRC may have resources to assist with PET imaging analysis and QC.
  - Maggie to be phased out of assisting with NAPS over the coming weeks.
- Other team status updates:

152. Contemporaneous Huey Lab coordinators meeting notes dated March 11, 2024 record, among Mr. Stein's items for the preceding week, "Set up compensation account for Maggie with Jana."

a. EXHIBIT C. Huey Lab Coordinators Meeting notes, March 11, 2024

## Mar 11, 2024 | Huey Lab - Coordinators Meeting

Attendees: [redacted] Colin Stein Masood Manoochehri [redacted] [redacted] Margaret Malloy [redacted]

- Colin
  - Last Week:
    - [redacted] Genetics
      - Sent data harmonized NPS variables to the Gary's team to run with the NP variables.
      - Prepared a slide of responsibilities for Brown team
      - Prepared document on milestone progress for Ted ahead of EAB meeting
    - Lithium
      - Columbia notified me that the ADDF did not complete a vendor form to have funds returned. Notified relevant persons. Continuing to track.
      - Touch base with Zach on progress for data analysis
    - REDCAP
      - Added UDS to Consent form and added additional compensation sections.
    - PAVES
      - Completed NCE application with Stacey and Ted.
      - Application is circulating for signatures. Continuing to track progress.
    - Set up compensation account for Maggie with Jana

153. Those two entries, generated by lab management in the ordinary course, corroborate Plaintiff's account that the petty cash arrangement existed, that Brown's finance office became involved in it in March 2024, and that Ms. Malloy was removed from NAPS immediately afterward.

154. Following Plaintiff's report, Brown's finance office, specifically Jana and Stacey Soares, assumed oversight responsibility for reconciling the petty cash irregularities arising from Ms. Malloy's participation.

155. Ms. Malloy was redirected away from the arrangement and phased out of NAPS and future MRI assignments.

156. Brown did not address the impropriety transparently with Plaintiff.

157. Brown took no step to protect Plaintiff, who had raised the concern.

158. Instead, scrutiny of Plaintiff's own work intensified following her report.

159. Contemporaneous Huey Lab meeting notes dated March 27, 2024 record, under "Lab / staffing needs update," an open question regarding "Limitations for CNE employees working

with us? Consider for future RA," listing "Petty cash funds," "Vacations/benefits different," and "Purchasing/travel through grant coverage?"

160. That entry establishes that lab management itself recognized, in its own records, that the participation of CNE-employed personnel in Brown-administered grant work raised petty cash and grant coverage problems of precisely the kind Plaintiff had reported earlier that month.

161. *EXHIBIT D. Huey Lab Meeting + Discussion notes, March 27, 2024.*

Mar 27, 2024| Huey Lab - Meeting + Discussion

Attendees:

- Edward Huey (out of office)
- ~~Masood Manoochehri~~
- Colin Stein

[redacted]

**AGENDA**

- Lab / staffing needs update
  - Addl RA for data collection - re-assess in coming month
    - CN prefer Nicole for familiarity with study, smooth transition
  - Megan Barker and RA
  - Room 306
  - Limitations for CNE employees working with us? Consider for future RA
    - Petty cash funds
    - Vacations/benefits different
    - Purchasing/travel through grant coverage?
  - Data Manager interviews
  - Huey Lab calendar - invite for all March/April visits
- Expense reports
  - Per Stacey Soares, please send receipts/business justifications/project to be charged to Jana and she can take it from there and generate Expense Report
    - Do not use Workday tool; Jana will use it to create on our behalf or give guidance on how to handle specific expenses
- Asana updates
  - Starter purchase - Jana working on this for a 1-year purchase for 4 users
  - Convention for participant names
    - First letter of first name, first 3 letters of last name
  - Double check everyone can receive notifications, show how to customize
  - Use of comments as status updates
  - What channel of communication for different sorts of items - discussion for next meeting

162. Defendants thereafter continued to rely on the asserted operational necessity of on-site coordination for post-MRI participant payments, the very arrangement Plaintiff had reported and opposed, as a stated justification for requiring Plaintiff's on-site presence notwithstanding her standing AWA as fully remote, and pending accommodation request for alternative work arrangements to manage sensory needs.

*Fourth Discriminatory and Retaliatory Act — Denial of Accommodations and the Four-Day On-Site Requirement*

163. On January 30, 2024, Plaintiff formally requested reasonable accommodations through Brown's Human Resources department, through Brown's ADA Coordinator Debi Horvath, and

through Broadspire, Brown's third-party accommodation administrator, under Broadspire Accommodation Request A-2024-025877.

164. On March 22, 2024, a licensed medical provider evaluated Plaintiff and formally cleared her to return to work with reasonable accommodations.

165. On April 4, 2024, in response to a proposed meeting that would have included Mr. Stein, Plaintiff wrote to Ms. Horvath: "I would prefer to have an initial meeting separately. At this point, I don't feel prepared to discuss sensitive matters, which I'd like to keep private, especially considering previous concerns regarding interpersonal conflict and its impact on my mental well-being."

166. Ms. Horvath responded the same day: "Certainly. We can keep this meeting for us. I'll advise Colin I'd like to meet first with you and then reschedule a meeting to include him."

167. Also on April 4, 2024, Ms. Horvath wrote to Plaintiff summarizing accommodation discussions held with Mr. Stein, describing "clear defined duties to assist with transition back to work with onsite responsibilities, clear defined work hours which allows for some flexibility, the calendar use and communication and use of Asana," and identifying as "the immediate items we discussed: noise canceling headset, desk fan, flexibility to work in other areas while onsite, confidentiality."

168. On April 16, 2024, Ms. Horvath cancelled a scheduled Return to Work Planning meeting with the note, "This meeting will be rescheduled."

a. EXHIBIT E. Calendar cancellation notice, April 16, 2024.

BROWN [redacted]

**Canceled event with note: RTW Planning @ Tue Apr 16, 2024 4pm - 4:30pm (EDT)** [redacted]

[redacted]

**Debi Horvath** <debi_horvath@brown.edu> Tue, Apr 16, 2024 at 12:45 PM
Reply-To: Debi Horvath <debi_horvath@brown.edu>
To: [redacted]

**This event has been canceled and removed from your calendar with a note:**
"This meeting will be rescheduled."

169. Minutes later, on the same day, Ms. Horvath wrote to Plaintiff: "I was advised there may be changes to your reporting structure. Said differently you may change managers which I feel is important to the accommodation plan. I'll reschedule the meeting for later this week."

a. EXHIBIT F. Email from Debi Horvath to Plaintiff, April 16, 2024, 12:47 p.m.

**re: Meeting reschedule**
5 messages

**Horvath, Debi** <debi_horvath@brown.edu> Tue, Apr 16, 2024 at 12:47 PM
To: [redacted]

Hi [redacted]

I was advised there may be changes to your reporting structure .
Said differently you may change managers which I feel is important to the accommodation plan. I'll reschedule the meeting for later this week.

Debi

**Debi Horvath MA CRC**
Asst. Director of Leave and Accommodation Services
*she/her/hers*

**Benefits & Wellness**

[redacted]

BROWN
University Human Resources

170. Ms. Horvath's statement establishes that Brown's own Leave and Accommodation office understood the contemplated change in Plaintiff's supervision to be directly connected to her accommodation needs, rather than an independent management decision.

171. On May 6, 2024, Plaintiff sent a detailed written accommodation request to Defendants identifying the following accommodations connected to her documented disabilities.

a. Advance notice of no less than forty-eight (48) hours for scheduled meetings, to allow preparation time and reduce anxiety-related cognitive impairment;

b. Written communication options and written summaries of verbal instructions, due to stress-induced mutism and documented difficulty with verbal fluency under pressure;

c. Flexible scheduling and continuation of her Alternative Work Arrangement ("AWA") permitting remote work, due to sensory processing difficulties and the need for environmental control to manage panic symptoms;

d. No impromptu or same-day meetings without notice, as surprise meetings triggered panic episodes; and

e. Permission to use noise-canceling headphones, due to sensory processing difficulties.

172. Defendants failed to engage in good faith in the interactive process required under the ADA.

173. Defendants denied Plaintiff's request for flexible remote work and forced back on-site while retaining AWA as fully remote.

174. Defendants denied that request notwithstanding medical documentation supporting the need.

175. Defendants denied that request notwithstanding that Mr. Stein worked remotely from New York City (while in a supervisory role, and after removed as supervisor), and at least two other lab staff members were required on-site less than the plaintiff with disabilities that requested accommodations.

176. Defendants denied that request notwithstanding Plaintiff's successful remote work history at Columbia and during her initial months at Brown.

177. Defendants denied that request notwithstanding the absence of any legitimate business justification for requiring on-site presence.

178. Defendants provided conflicting return-to-work guidelines and as retaliation for reporting Mr. Stein's behavior as manager, suddenly required Plaintiff to work on site four (4) days per week during her medical recovery period.

**Meeting today**

[redacted] Tue, Apr 23, 2024 at 5:07 PM
To: Edward Huey <edward_huey@brown.edu>
Cc: Masood Manoochehri <masood_manoochehri@brown.edu>

Hi Ted,

Thank you for your email and for summarizing some of our discussion from last Tuesday. I apologize for my delayed response, as I was out on PTO from Wednesday to Friday attending the "Leader as Coach" workshop.

I have a few modifications to propose regarding the plan you outlined, as it differs from what Debi and Colin shared with me on behalf of the lab. However, I would like to review my suggestions with the accommodations team before presenting them to you and Masood. I have a one-on-one meeting with Kenia from BioMed HR and Debi from Leave & Accommodations HR this week. Debi will facilitate a discussion following our meeting to present a plan and next steps to you and Masood.

In the meantime, I will notify you or Masood if my schedule or availability changes, and will update my in-office schedule on the team calendar, as Masood advised. I will continue to communicate with Debi to ensure mutual understanding of the procedures and accommodations, ensuring that I am well-positioned to meet the lab's and my standards.

Please let me and/or Debi know if there is anything else you would like us to consider as we continue to review and finalize an effective return-to-work plan.

Best regards,
[redacted]

BROWN
[redacted]

**Confidentiality Agreement:** The information contained in this e-mail transmission from Brown University contains information that is confidential and/or legally privileged. The information is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or taking of action in reliance on the contents of this email violates Brown's policy. If you have received this email in error, please immediately notify us by telephone so that we can arrange for the email's deletion and the appropriate transmission of this message.

On Tue, Apr 16, 2024 at 5:12 PM Huey, Ted <edward_huey@brown.edu> wrote:

Forwarding to Masood as well.

---------- Forwarded message ---------
From: **Huey, Ted** <edward_huey@brown.edu>
Date: Tue, Apr 16, 2024 at 5:11 PM
Subject: Meeting today
[redacted]

Hi [redacted]

Thanks for talking today. I wanted to summarize some of the points we discussed.
1. We will continue to remove Colin from a supervisory role for you. Please let me know about any problems or issues that may arise about this.
2. You agree to be on site 10 AM to 6 PM 4 days a week, unless you have outside appointments.
3. If you have outside appointments, other reasons to be absent, or need to miss meetings, evaluations, or other work duties, please let Masood and me know in advance.
4. Please make any requested modifications to your back to work plan by COB Friday.

I had a meeting with HR scheduled for this afternoon, but they didn't come, so it will have to be rescheduled for later. I'll keep you informed.

Thanks!

--Ted

a.

179. That requirement exceeded the on-site obligation imposed on any other coordinator or senior research staff member, each of whom worked on site a maximum of three days, two days, or entirely remotely from another state.

180. When Plaintiff consulted Human Resources, Ms. Horvath and the Leave Office about her AWA status upon returning from medical leave, she was expressly instructed to retain her remote AWA designation while returning to work.

181. Notwithstanding that institutional guidance, Defendants required Plaintiff to work on site four days per week, contradicting the AWA that remained formally in place.

182. Defendants refused to consistently use the accessibility recording tools Ms. Horvath had identified and provided, such as *supernormal.ai*, especially during critical and sudden performance expectations sessions used against her.

183. On or about July 19, 2024, Brown convened an Accommodation Follow-up Meeting for Plaintiff, the stated purpose of which was "to review the effectiveness of the approved accommodations" and to assess "whether they meet the individual's needs and enable the performance of essential job functions."

184. Responses were directed to Ms. Horvath. Session was recorded using supernormal and saved under account set by Ms. Horvath.

185. The approved accommodation plan reviewed at that meeting provided for "[a] default expectation of three on-site days per week," which the plan explained would "minimize anxiety around interpersonal or social distractions and help manage sensory input effectively". Defendants never provided noise-cancelling headphones or other requested accommodations.

186. Defendants nonetheless required Plaintiff to be on site four days per week, in direct contradiction of the accommodation plan Brown itself had approved.

187. The approved plan further provided for "[t]he option to leave the Butler campus during sensory overload and complete tasks off-site," for the option to use alternative workspaces on site, for noise-cancelling headphones, for a desk or workstation fan, and for advance information and clear expectations before meetings.

188. In the follow-up review Plaintiff reported that the accommodations were only partially available to her as approved, that she was experiencing difficulty with them, that she had been only partially trained in the tools provided, and that additional accommodations were needed.

189. Plaintiff recorded in that review that the noise-cancelling headphones approved as an accommodation had still not been provided, approximately six months after her formal accommodation request of January 30, 2024.

190. Plaintiff also recorded that the requirement that requests to work remotely be submitted a week in advance did not suit an accommodation intended to address physical needs and sensory overload, which by its nature arises without warning.

191. The interactive process Brown itself had initiated was therefore never concluded and Ms. Horvath would often reschedule meetings.

Denial of a Meeting-Summarization Tool Defendants Already Used

192. On May 20, 2024, Mr. Manoochehri sent an email to Plaintiff, Coordinator A, Coordinator C and Mr. Stein attaching notes that "Supernormal AI" had assembled from that morning's coordinators meeting.

**Subject:** Coordinators Meeting - 5/20/2024 -Supernormal Notes
**Date:** Monday, May 20, 2024 at 2:56:59 PM Eastern Daylight Time
**From:** Manoochehri, Masood <masood_manoochehri@brown.edu>
**To:** [redacted]
Colin Stein <colin_stein@brown.edu>
**Attachments:** Coordinators Meeting_2024-05-20_Supernormal Notes.docx

Hi everyone,

Attaching here the notes that 'Supernormal AI' assembled from our meeting this morning.

Thoughts? I am pretty impressed with the 'Action items'. The best case use for us could be to automatically send this document to everyone after the call to ensure that people don't miss adding any items to their Asana tasks.

Let me know what you think?

Thanks,
-Masood

--
Masood Manoochehri
Senior Research Associate
a. Department of Psychiatry and Human Behavior

193. In that email Mr. Manoochehri wrote: "*I am pretty impressed with the 'Action items'. The best case use for us could be to automatically send this document to everyone after the call to ensure that people don't miss adding any items to their Asana tasks*."

194. Defendants therefore possessed, and were actively using, a tool that produced written summaries of verbal meetings, and Plaintiff's interim supervisor had himself proposed distributing those summaries to the team as a matter of routine.

195. Among the accommodations Plaintiff requested on May 6, 2024 were written communication options and written summaries of verbal instructions, owing to her documented stress-induced mutism and difficulty with verbal fluency under pressure.

196. Plaintiff requested that Supernormal AI, or a comparable tool, be used in her performance expectation meetings. Defendants denied that request and Mr. Manoohchehri would often claim that he “forgot”.

197. As of July 19, 2024, in Brown's own accommodation follow-up documentation, Plaintiff recorded that she had "suggested using AI tools like Supernormal AI as a note-taker in meetings, but this hasn't been implemented."

198. The accommodation Plaintiff requested would have imposed no cost and no operational burden on Defendants. It was a tool Defendants already possessed, already used, and which Plaintiff's interim supervisor had recommended expanding.

199. Defendants nonetheless continued to use that tool for other meetings while denying its use in Plaintiff's performance expectation meetings, which were conducted outside Brown's standard performance improvement process, without advance notice or written agendas, and on which Defendants subsequently relied in documenting Plaintiff's performance.

200. The denial left Plaintiff without any verifiable record of what was said in those meetings, and unable to address discrepancies between what was said to her and what was afterward recorded about her performance.

*Criticism of Plaintiff's Medical Leave in Her Performance Review*

201. Plaintiff took accrued PTO and an unpaid FMLA leave following her November 2023 motor vehicle accident and interpersonal workplace difficulties with management.

202. Brown granted FMLA leave.

203. In Brown's July 2024 accommodation follow-up documentation, Plaintiff recorded that her use of that leave "was heavily criticized in the review, summarizing a year's worth of work as 'not effective at all.'"

204. Plaintiff further recorded that the assessment focused on recruitment metrics, which formed only a portion of her duties, while disregarding her work establishing Data Use and Material Transfer Agreements, contracts, Institutional Review Board submissions, MRI setup and SCID training.

205. Plaintiff also recorded that her performance evaluation was altered after the fact, shifting from Mr. Stein's initial summary to Mr. Manoochehri's final assessment, in a manner that contradicted earlier discussions involving multiple stakeholders, and that she was given no opportunity to address the change.

206. When Plaintiff provided detailed written documentation to management regarding her accommodation needs, she was told that management "didn't have time to read it."

207. Plaintiff reported that response to Ms. Horvath and Human Resources.

208. After Plaintiff raised concerns regarding the mishandling of her accommodations and the breakdown in communication between Broadspire and Brown's internal Human Resources and accommodation staff, Brown discontinued its use of Broadspire as third-party administrator following the May 2024 investigation, and now instructs employees to request reasonable accommodation internally.

*Fifth Discriminatory and Retaliatory Act — Surprise Meetings Outside the Performance Improvement Process*

209. Brown maintains a standard Performance Improvement Plan ("PIP") process governing the documentation and communication of performance concerns.

210. Defendants repeatedly convened meetings with Plaintiff described as "performance expectation meetings."

211. Those meetings were conducted outside Brown's standard PIP process.

212. Those meetings were scheduled without advance notice and without use of supernormal recording tool provided my accommodations.

213. Defendants scheduled those meetings notwithstanding Plaintiff's documented, repeatedly communicated need for advance notice and predictable, structured communication.

214. Those meetings triggered panic episodes and impaired Plaintiff's ability to self-advocate, owing to her documented processing speed limitations and stress-induced mutism.

215. In early May 2024, Dr. Huey sent Plaintiff an email requesting a same-day meeting without advance notice.

216. At that time Dr. Huey was the new MAP Director and was under pressure from Mr. Menard and Mr. Stein, including with respect to Ms. Malloy's position on the grant budget and comparisons drawn between Ms. Malloy's role and Plaintiff's.

217. Mr. Stein had characterized Plaintiff as "difficult" to others following her reports regarding management.

218. The unannounced same-day meeting request triggered a panic attack.

219. Plaintiff was forced to leave the office and missed a scheduled team meeting as a result.

220. Plaintiff documented the incident in detail and reported it to Ms. Horvath and Human Resources.

221. Brown conducted an internal investigation in response to Plaintiff's reports.

222. The investigation included interviews with MRI and MAP staff members regarding the workplace environment, supervisory conduct, and the off-the-books staffing arrangement.

223. The investigation resulted in personnel actions that substantiated Plaintiff's concerns.

224. Ms. Malloy was removed from the team.

225. Mr. Stein was removed from direct supervision of Plaintiff.

226. Mr. Menard's employment was terminated in or about early September 2024, following corroborated complaints.

227. At a program-wide town hall, Brown stated that Mr. Menard's removal was to ensure "safety."

228. Rather than supporting Plaintiff or addressing the underlying systemic issues, Defendants structured these personnel changes through interim Workday supervisory designations that obscured the nature of the corrective action taken.

229. Throughout the investigation period, Plaintiff's coworkers did not know whether she would remain part of the team.

230. That uncertainty produced professional isolation and social exclusion that exacerbated Plaintiff's psychiatric symptoms.

*Sixth Discriminatory and Retaliatory Act — Redistribution of Plaintiff's Duties and Training of Her Replacement*

231. Nicole Belanger was introduced to the Huey Lab as an unpaid intern in Fall 2023.

232. During 2023 and 2024, Ms. Belanger was systematically trained in duties mirroring Plaintiff's core responsibilities, including work on the NAPS and PAVES studies and outreach functions.

233. Contemporaneous Huey Lab meeting notes dated March 27, 2024, created during a period in which Plaintiff was returning from approved medical leave, record a staffing discussion for an additional research assistant in which lab management expressed a stated preference to "prefer Nicole for familiarity with study, smooth transition." (Exhibit D, supra.)

234. On June 6, 2024, Mr. Manoochehri sent an email to Huey Lab staff regarding summer scheduling.

235. In that email, Mr. Manoochehri identified the lab's planned commitments for July, August and September 2024, listing among them "planned staff trainings (JP SCID, Nicole if we get her on board in July)."

236. That email establishes that, as of June 6, 2024, lab management was treating the onboarding and training of Ms. Belanger as a scheduled operational commitment for the summer of 2024.

a.

On Thu, Jun 6, 2024 at 8:00 AM Manoochehri, Masood <masood_manoochehri@brown.edu> wrote:

Hi everyone,

Could I ask for a bit of an earlier heads-up if you are planning on taking days off in July/August/September?

Between the hopefully sustained pace of NAPS/PAVES visits and Genetics of NPS data work, planned staff trainings (JP SCID, Nicole if we get her on board in July), NDA upload, NAPS data prep for Megan, new study start-up (ALLFTD, BCBI), ISFTD conference (I plan to present and will likely be out for 2 weeks), there is a lot going on and I want to make sure efforts are planned out appropriately.

Even if you are not sure of exact dates yet, just giving me an estimate would be helpful. If all goes according to plan, I expect that the fall will be more stable with fewer new items coming online.

Thanks,

-Masood

*EXHIBIT G. Email from Masood Manoochehri to Huey Lab staff, June 6, 2024, 8:00 a.m.*

237. On June 10, 2024, Mr. Manoochehri sent an email to Plaintiff and Coordinator A bearing the subject line "Weld-309 additional workstation."

238. That email began: "Looking ahead to Nicole potentially joining, I was thinking about the office organization."

239. The email set out a plan to reconfigure the shared office and to acquire an additional desk, stating that Mr. Manoochehri was "thinking of sliding the conference table over a bit towards JP and setting up a workstation on another smaller desk."

240. The email concluded: "We will need to be in the same office as Nicole for training purposes over the summer and fall."

241. That email establishes that, as of June 10, 2024, lab management was arranging physical workspace and a training plan extending through the fall of 2024 for the individual who would ultimately be hired into a position performing substantially the duties Plaintiff then held.

a.

**Subject:** Weld-309 additional workstation
**Date:** Monday, June 10, 2024 at 5:35:36 PM Eastern Daylight Time
**From:** Manoochehri, Masood <masood_manoochehri@brown.edu>
**To:** [redacted]

Hi [redacted] and [redacted]

Looking ahead to Nicole potentially joining, I was thinking about the office organization. My initial plan had us moving the conference table over a bit and using it as an ad hoc workstation.

It's been nice though the past few weeks using the conference table during lunch and meetings, so now I am inclined to keep it there.

Instead, I was thinking of sliding the conference table over a bit towards JP and setting up a workstation on another smaller desk right across from the radiator, something along these lines: https://www.wbmason.com/ProductDetail.aspx?ItemDesc=Alera-Valencia-Series-Mobile-Workstation-Desk-4138-x-2363-x-30-Modern-Walnut&ItemID=ALEVA204224WA&uom=EA&COID=&SearchID=1139615180&ii=12

I discussed this plan with JP and he was OK with it. I think it would affect him most since it reduces the space behind him a bit. But also let me know this week if you think this is OK, so I can discuss with Sam on Friday.

Compared to the alternatives (our whole group moving into another office), I think this is a better bet. We will need to be in the same office as Nicole for training purposes over the summer and fall.

Thanks,
-Masood

--
Masood Manoochehri
Senior Research Associate
Department of Psychiatry and Human Behavior
Division of Biology and Medicine | Brown University
Memory and Aging Program | Butler Hospital

*EXHIBIT H. Email from Masood Manoochehri to Plaintiff and Coordinator A, June 10, 2024, 5:35 p.m.*

242. On or about April 17, [2024], an internal Asana task assigned within the Huey Lab's Study / Data Management project directed lab staff to "Review Research Assistant hiring job description."

243. Mr. Manoochehri commented on that task: "Just added in the link to the job description here for folks to review, pls mark off as complete if you don't see any issues with it or add a comment to the document if you do. Ted is asking about the salary source, want to submit to Kristen Wed, 4/17."

244. That record establishes that lab management was preparing to recruit an additional research assistant, and was identifying a salary source to fund that position, during the same period in which Defendants later asserted that funding for Plaintiff's own position was unavailable.




a.

*EXHIBIT I. Asana task and comment, Huey Lab Study / Data Management project, April 17.*

245. During the same period, Defendants redistributed major duties of Plaintiff's role to Mr. Stein and later to Mr. Manoochehri.

246. Those redistributed duties included IRB management.

247. Those redistributed duties included data management with NIH repositories.

248. Those redistributed duties included recruitment collaborations with internal and external groups.

249. Those redistributed duties included outreach functions.

250. In or about Spring 2024, Defendants imposed on Plaintiff clinical duties outside her research role, specifically clinic MMSE requirements, which had not previously formed part of her position.

251. Those clinical duties were imposed in a manner that required Plaintiff's on-site presence.

252. As Plaintiff's interim supervisor, Mr. Manoochehri monitored and recorded the number of minutes Plaintiff spent researching definitions and background information relating to the Structured Clinical Interview for DSM Disorders ("SCID").

253. The SCID is the primary diagnostic instrument central to the NIH-funded NAPS study and directly relevant to Plaintiff's job duties.

254. The SCID research activity Mr. Manoochehri timed was the diagnostic record reconciliation described supra, which required Plaintiff to verify diagnoses across the NetSCID and REDCap systems, apply ICD coding, and resolve a backlog of incomplete legacy records transferred from Columbia.

255. This minute-by-minute monitoring of routine, job-related research activity intensified Plaintiff's documented anxiety and undermined her ability to perform her duties without fear of punitive scrutiny over ordinary work tasks.

256. No comparable monitoring was applied to male employees, including Mr. Stein, who were permitted to work remotely without comparable oversight.

*Seventh Discriminatory and Retaliatory Act — Abandonment Following the August 28, 2024 Workplace Crisis*

257. On August 28, 2024, Plaintiff suffered a severe panic attack while at her desk.

258. The panic attack followed another unannounced performance expectation meeting conducted outside the PIP process, and when team members were going to a happy hour.

259. Plaintiff was excluded and denied equal access from participating in team building activity.

260. Multiple coworkers witnessed Plaintiff become pale, tearful, physically frozen, and unable to speak.

261. Defendants failed to activate any emergency response protocol.

262. Defendants failed to offer ADA-compliant crisis support.

263. Defendants failed to contact occupational health services.

264. On August 29, 2024, Plaintiff reported the incident in writing to her supervisor and to Human Resources.

265. In that written report Plaintiff stated that she had been "completely paralyzed" and unable to "express what [she] needed in the moment."

266. Plaintiff further documented that "the experience affected [her] ability to sleep that night."

267. Defendants took no corrective or supportive action in response to Plaintiff's August 29, 2024 report.

*Eighth Discriminatory and Retaliatory Act — Termination*

268. Within approximately one week of the August 28, 2024 panic attack and Plaintiff's August 29, 2024 written report, Defendants informed Plaintiff that her position was being "phased out" due to a lack of funding.

269. Plaintiff was notified of the decision to terminate her employment on or about September 6 through 10, 2024.

270. Plaintiff's termination was effective in October 2024.

271. The stated reason for Plaintiff's termination had no basis in fact.

272. The NIH R01 grant funding Plaintiff's position remained active through May 31, 2025, approximately eight months after her termination.

273. The lab was at that time actively recruiting new research assistants.

274. Plaintiff's job duties were redistributed to other employees rather than eliminated.

275. Defendants made no effort to reassign Plaintiff to comparable duties notwithstanding available funding.

276. Defendants never offered Plaintiff, or considered Plaintiff for, reassignment to a vacant position as part of the reasonable accommodation process before terminating her.

277. Mr. Stein was excluded from departmental meetings for the entirety of the month preceding Plaintiff's termination.

278. Shortly before her termination, Dr. Huey informed Plaintiff that she could work from anywhere for the remainder of her employment.

279. That reversal came after months in which Defendants had maintained that on-site presence was operationally necessary and had denied Plaintiff's remote work accommodation on that basis.

280. The close temporal proximity between Plaintiff's August 28, 2024 panic attack, her August 29, 2024 written report to Human Resources, Mr. Menard's termination at the end of August (announced in early September 2024) following corroborated complaints, and Plaintiff's own notice of termination on September 6, 2024, supports an inference of retaliation.

281. On October 6, 2024, Plaintiff submitted a written Formal Complaint of Harassment, Discrimination, and Accommodation Failures to Brown's Office of Equity Compliance and Reporting, Division of Campus Life.

282. In that complaint Plaintiff reported a hostile work environment, inconsistently applied accommodations, and retaliatory conduct, and identified Mr. Menard's influence over MAP management as the source of the pressure she describes.

283. Plaintiff identified herself in that complaint as neurodivergent, with conditions including ADHD, OCD and anxiety, and as a Black Dominican American who had faced intersecting challenges related to race and disability.

284. Plaintiff reported in that complaint that Mr. Menard pressured nurse practitioners and research staff, including Nurse Melanie and Dr. Courtney Bodge, to communicate negative and inaccurate messages about the performance of lab research assistants.

285. Plaintiff further reported that when a targeted research assistant requested a meeting to address the inaccuracies, those staff members did not attend and called out sick.

286. Plaintiff reported that following her accommodation requests she was subjected to sudden office visits by Dr. Huey or Mr. Manoochehri to verify whether she was at her desk, a practice that had not previously been standard, and that time spent away from her desk, including brief hallway conversations, was noted and used against her in performance reviews while other lab members engaged in the same conduct without consequence.

287. Plaintiff reported that her requests to record performance expectation meetings using Supernormal AI were denied, which made it difficult to address discrepancies between what was said to her informally and what was recorded in official documentation.

288. Plaintiff requested in that complaint that Brown apply her accommodations consistently, investigate the systemic issues she identified, provide training on ADA compliance and anti-retaliation practices, continue her health insurance coverage and access to mental health services, and consider her for alternative roles within the university or a temporary leave of absence.

289. Plaintiff described her condition at that time as a persistent dissociative state accompanied by frequent breakdowns and episodes of paralysis, and stated that she had come close to requiring hospitalization.

290. Plaintiff's submission of that complaint constituted protected activity under the ADA, the Rehabilitation Act, Title VII, FEPA, and RICRA.

291. Defendants did not provide the accommodations Plaintiff requested in that complaint or in previous requests or meetings with Accommodation and Leave staff, did not offer her an alternative role, and did not extend her health insurance coverage.

*Post-Termination Discovery of Same-Role Rehire*

292. Following her termination, Plaintiff learned that Ms. Belanger had been formally hired into a Research Assistant position within MAP.

293. Ms. Belanger performs in that position substantially the same duties Plaintiff previously performed.

294. The CNE/Butler Hospital MAP program website lists Nicole Belanger, BS, as a Research Assistant, and states that before joining MAP in that capacity she "volunteered with the NAPS/PAVES studies and the outreach team."

295. Ms. Belanger's publicly accessible LinkedIn profile lists her title as "Research Assistant at Brown University" and her education as a Bachelor of Science in Neuroscience from Stonehill College, 2020 to 2024. This is the same intern that was onboarded by Mr. Stein and Mr. Menard.

296. Plaintiff has further confirmed Ms. Belanger's continued employment in that role as of February 2026 through a former colleague with direct personal knowledge of MAP's current staffing, whose identity is known to Plaintiff and may be disclosed to the Court under seal or protective order if required.

297. Ms. Belanger's qualifying research experience consisted principally of the training she received while performing Plaintiff's own duties during 2023 and 2024.

298. Although Ms. Belanger's title, Research Assistant, differs from Plaintiff's former title, Program Coordinator, the core duties of the position are substantially the same duties Plaintiff previously performed.

299. Defendants trained Plaintiff's eventual replacement during the same period in which scrutiny of Plaintiff's own role was escalating, and terminated Plaintiff once that transition was substantially complete.

## V. NIH WORKPLACE SAFETY AND FEDERAL GRANT COMPLIANCE

300. At all relevant times Defendants operated a federally funded research environment under NIH R01 grant R01AG062268.

301. The NIH Grants Policy Statement in effect throughout the relevant period provided that "NIH recipients are expected to provide safe and healthful working conditions for their employees and foster work environments conducive to high-quality research."

302. NIH Notice NOT-OD-22-129, issued May 10, 2022 and in effect throughout Plaintiff's employment, required recipient institutions to notify NIH when individuals identified as PD/PI or other Senior/Key personnel in an NIH notice of award "are removed from their position or are

otherwise disciplined by the recipient institution due to concerns about harassment, bullying, retaliation or hostile working conditions," with notification due within thirty (30) days of the removal or disciplinary action.

303. Mr. Stein was identified as Senior/Key personnel and/or participated in the submission of the Research Performance Progress Report (RPPR for NIH grant at all relevant times).

304. Defendants permitted the undisclosed, off-the-books staffing arrangement described above, which created confusion regarding supervisory authority, petty cash handling and financial compliance, and reporting lines within an NIH-funded project.

305. Defendants failed to address concerns regarding supervisory misconduct, harassment and hostile management practices through appropriate corrective action.

306. Defendants restructured management, through interim Workday supervisory designations, in a manner that insulated the underlying conduct from formal reporting after Plaintiff's concerns had been corroborated.

307. Defendants allowed a hostile, retaliatory and destabilizing environment to persist after notice, foreseeably exacerbating Plaintiff's panic disorder and undermining her ability to function safely.

308. Plaintiff does not allege that research participants were placed at risk.

309. NIH has since recognized that evasion of institutional accountability through personnel maneuvering is a significant problem at NIH-funded institutions. On August 12, 2026, NIH issued Guide Notice NOT-OD-26-097, "Recent Updates: Supporting a Safe and Respectful Workplace at Institutions that Receive NIH Funding," implementing revisions to the NIH Grants Policy Statement informed by Public Law 119-75. Announcing those authorities on September 9, 2026, NIH explained that it had "found that some institutional investigations into allegations of hostile working conditions were prematurely closed when the individuals whose conduct was being investigated left their institutions," in some cases through "quiet resignations," producing "a potential evasion of accountability related to the NIH-supported research, with concerns left unresolved." NIH Extramural Nexus, New NIH Authorities to Strengthen Accountability in Hostile Work Environment Investigations (Sept. 9, 2026). Under the revised policy, "an individual's separation from the institution … does not, by itself, end the institution's obligation to investigate, reach findings, and document conclusions."

310. While that guidance postdates the events giving rise to this action, it reflects NIH's own subsequent recognition, as the federal agency with regulatory authority over the research environment at issue, of the general problem of institutional accountability being evaded through personnel maneuvering.

311. Defendants' failures with respect to their obligations as recipients of federal research funding are relevant to Plaintiff's Rehabilitation Act claims because they demonstrate deliberate indifference to the rights of disabled employees in federally funded programs.

## VI. RETALIATION IN VIOLATION OF THE FALSE CLAIMS ACT AND THE WHISTLEBLOWER PROTECTIONS

312. Plaintiff engaged in protected activity when she reported to Brown's finance office an arrangement under which Research Assistants authorized to hold petty cash accounts on Brown's NIH-funded grant, including Plaintiff, were required to route their own grant-authorized

petty cash funds to cover participant compensation handled by a Lifespan employee who was not an authorized grant recipient.

313. Plaintiff engaged in further protected activity when she directly opposed that arrangement to Mr. Stein and Mr. Menard and refused to continue sharing her own petty cash funds.

314. Plaintiff engaged in further protected activity when she reported supervisory misconduct and management restructuring she reasonably believed was designed to avoid mandatory reporting obligations in a federally funded research environment.

315. Plaintiff reasonably believed that the conduct she reported and opposed concealed from Brown's compliance officer the true recipient and use of federal grant funds.

316. These concerns related to fraud on, or violations of obligations to, the federal government within the meaning of 31 U.S.C. § 3730(h).

317. This conduct constituted protected activity under the RIWPA, R.I. Gen. Laws § 28-50-3.

318. Defendants knew of Plaintiff's protected activity.

319. After Plaintiff engaged in protected activity, Defendants subjected her to intensified scrutiny, hostile supervision, denial of accommodations, redistribution of her duties, isolation, and ultimately termination.

320. Plaintiff reserves all rights to pursue additional remedies under the False Claims Act, 31 U.S.C. § 3729 et seq., including qui tam claims that may be filed under seal in accordance with 31 U.S.C. § 3730(b).

## VII. DISABILITY DISCRIMINATION IN VIOLATION OF THE ADA, REHABILITATION ACT, FEPA, AND RICRA

*Adverse Employment Action*

321. Plaintiff began experiencing adverse employment action almost immediately after she disclosed her disabilities and requested reasonable accommodation. Specifically, Defendants withdrew an established accommodation practice, denied her requested accommodations, imposed an on-site requirement exceeding that of every comparator, subjected her to meetings conducted outside the standard performance process, stripped her of her core duties, trained a replacement in those duties, failed to respond to a documented medical crisis in the workplace, and terminated her employment.

*Failure to Provide Reasonable Accommodation and to Engage in an Interactive Dialogue*

322. Defendants were aware that Plaintiff needed reasonable accommodation due to her disabilities.

323. Plaintiff requested specific, reasonable accommodations connected to her documented disabilities.

324. Defendants refused to provide the medically documented reasonable accommodations Plaintiff requested.

325. Defendants failed and refused to engage in a dialogue relative to the necessity and nature of the accommodations Plaintiff required, which in and of itself qualifies as prohibited disability discrimination.

326. The requested accommodations were reasonable and would not have posed an undue hardship on Defendants, as evidenced by the fact that similarly situated employees were permitted to work remotely without restriction.

327. Defendants further failed to consider reassignment to a vacant position as part of the reasonable accommodation process before terminating Plaintiff, notwithstanding that a position performing substantially Plaintiff's duties was filled within months of her termination.

*Hostile Work Environment*

328. The harassment to which Defendants subjected Plaintiff was sufficiently severe or pervasive to materially alter the conditions of her employment.

329. As a result of that harassment, Plaintiff experienced multiple, debilitating panic attacks in the workplace.

330. As a result of that harassment, Plaintiff required extended medical leave due to workplace-induced psychiatric decompensation.

331. As a result of that harassment, Plaintiff developed worsening PTSD symptoms, first diagnosed in April 2024.

332. As a result of that harassment, Plaintiff experienced dissociative episodes, stress-induced difficulties with verbal fluency, and cognitive shutdown.

333. Plaintiff's pre-existing ADHD and OCD did not prevent her from working full time successfully at Columbia for four years, or during her initial remote months at Brown.

334. Plaintiff's disabling psychiatric injuries resulted directly from Defendants' conduct.

335. On December 17, 2025, the New York City Human Resources Administration determined that Plaintiff is "EXEMPT FROM PARTICIPATING IN TEMPORARY ASSISTANCE WORK ACTIVITIES" because "according to medical evidence [she] is currently unable to work due to a medical/psychiatric issue."

336. On December 31, 2025, Plaintiff's treating psychiatrist completed a Treatment Clinician Report for that agency finding Plaintiff "[u]nable to work for at least 12 months."

337. Plaintiff was unemployable from October 2024 through at least February 2026, a period of sixteen (16) months.

## VIII. DISCRIMINATION ON THE BASIS OF SEX, RACE AND NATIONAL ORIGIN

338. Plaintiff is a woman.

339. Plaintiff is Hispanic/Latina. In her October 6, 2024 formal internal complaint Plaintiff described herself as a Black Dominican American facing intersecting challenges related to race and disability.

340. Plaintiff's national origin is Dominican.

341. Mr. Stein, a male colleague, was permitted to work entirely remotely from New York City for his duration of his employment while Plaintiff's AWA remained as remote, but was forced back into the office out of discrimination and retaliation for reporting manager.

342. Brown's leadership proactively enrolled Mr. Stein in its "Leader as Coach" management training.

343. Plaintiff was required to self-advocate for access for similar professional development programs, and was told that such trainings were reserved for managers only, notwithstanding that University HR confirmed that the program was available to all staff through Brown's Employee Assistance Program benefits, not only managers.

344. When Plaintiff and female colleagues raised concerns, they were told they were "too sensitive" and that they should "grow a thicker skin."

345. Female coordinators were subjected to heightened scrutiny and surprise performance meetings.

346. At least three male research staff within the lab were not subjected to comparable scrutiny.

347. Nurse practitioners and research staff, including Melanie Faust, NP and Dr. Courtney Bodge, reported to Brown that they had experienced a hostile work environment and that they too had suffered panic attacks in the workplace.

348. Following corroborated complaints, Mr. Menard, a male, was quietly removed from his position, and Brown publicly characterized his removal at a program-wide town hall as being to ensure "safety."

349. Plaintiff, a woman who had reported the same conduct, was terminated without support.

350. Plaintiff and other BIPOC coordinators were characterized as "unruly and uncooperative" for raising concerns.

351. Plaintiff was referred to as a "token" by management and a colleague reported this back to plaintiff. This was reported to Debi and HR.

352. Mr. Stein scrutinized the spelling of IRB materials prepared by Plaintiff notwithstanding that those materials had previously been approved and in plain language for the intended audience with different neurodegenerative conditions.

353. Defendants micromanaged and over-reviewed the work and materials of bilingual staff of Hispanic origin, including Plaintiff.

354. Other staff members reported that comments had been made about speech, code-switching and professionalism.

355. In Fall 2023, at the time Plaintiff was preparing to relocate to Rhode Island and while Ms. Malloy's off-the-books comparison role was being introduced, Mr. Stein stated to other lab colleagues, "I wouldn't hire her if it had been up to me," referring to Plaintiff.

356. These disparities demonstrate discriminatory intent on the basis of sex, race and national origin, and not merely differences in treatment.

## IX. GENERAL EMPLOYMENT LAW ALLEGATIONS

Joint and Integrated Employer

357. At all relevant times Brown and CNE jointly operated MAP as a single integrated research program.

358. MAP was funded in part through NIH grant R01AG062268, administered by Brown.

359. Mr. Menard, a CNE employee, served as Operations Manager for MAP and exercised operational authority over MAP staffing, including Plaintiff's role and schedule.

360. Mr. Menard participated in directing the staffing arrangement described above, under which a Lifespan employee performed work on a Brown-administered federal grant and managed clinical duties outside research roles.

361. CNE maintained human resources procedures and compliance activities relevant to Plaintiff's role.

362. Ms. Malloy, a Lifespan employee, performed work on the Brown-administered NAPS study alongside Plaintiff and under the same operational direction.

363. Plaintiff's duties were materially altered by the participation of a Lifespan employee in a Brown-managed grant and addition of clinical responsibilities.

364. In or about December 2022, Dr. Huey transferred his research program from Columbia University Medical Center to Brown, and Plaintiff was hired to assist in executing that transfer.

365. At all relevant times Dr. Huey held appointments at both Brown and Butler Hospital.

366. Grant funding for Dr. Huey's research program was held at Brown, while a substantial portion of the on-site research was conducted at Butler Hospital.

367. On January 31, 2023, Plaintiff wrote to Columbia's Sponsored Projects Administration, copying Brown's Contract Office, Care New England's Office of Sponsored Projects, Butler Hospital's Contract Office at Care New England, Mr. Menard, Mr. Stein and Dr. Huey, stating: "Dr. Huey holds dual roles at Brown and Butler. The funding will be held at Brown, but much of the on-site research will be conducted at Butler, and Dr. Huey would prefer to store the samples there."

368. Mr. Menard, using a Butler Hospital electronic mail address, was copied on each message in that correspondence.

369. On April 17, 2023, Brown and Care New England executed a Simple Letter Agreement for the Transfer of Materials governing the transfer of biological materials collected by Dr. Huey's research group.

370. In that agreement, Brown University is identified as the PROVIDER and Care New England - Butler Hospital is identified as the RECIPIENT.

371. Dr. Edward Huey is identified in that same agreement both as the Provider Scientist, acting for Brown, and as the Recipient Scientist, acting for Care New England - Butler Hospital.

372. That agreement was executed for Brown by Jennifer Welch, Director of Research Agreements and Contracting, and for Care New England - Butler Hospital by Stephen E. Burke, CPA, MBA, Vice President of Finance.



PROVIDER INFORMATION and AUTHORIZED SIGNATURE:

Provider Scientist: Dr. Edward Huey

Provider Organization: Brown University

Address: 1 Prospect St.
Providence, RI 02912 USA
ResearchContracts@brown.edu

Name of Authorized Official: Jennifer Welch

Title of Authorized Official: Director, RAC

Certification of Authorized Official: This Simple Letter Agreement has ☐ / has not ☒ [check one] been modified. If modified, the modifications are attached.

DocuSigned by: Jennifer Welch — 04/17/2023 | 2:01 PM EDT

Signature of Authorized Official — Date

RECIPIENT INFORMATION and AUTHORIZED SIGNATURE:

Recipient Scientist: Dr. Edward Huey

Recipient Organization: Care New England – Butler Hospital

Address: 345 Blackstone Blvd. Providence, RI 02906

Name of Authorized Official: Stephen E. Burke, CPA, MBA

Title of Authorized Official: Vice President, Finance

Stephen E. Burke — 4/17/2023 | 9:28:13 AM PDT

Signature of Authorized Official — Date

Certification of Recipient Scientist: I have read and understood the conditions outlined in this Agreement, and I understand that I must abide by them to receive and use the MATERIAL.

Edward Huey — 4/11/23

Recipient Scientist — Date

a.

EXHIBIT J. Simple Letter Agreement for the Transfer of Materials, Brown University and Care New England - Butler Hospital, signature page, executed April 17, 2023.

373. Exhibit A to that agreement identifies the transferred materials as "Human plasma aliquots collected by Dr. Huey's research group as part of the project entitled 'Neurodegeneration-Associated Psychiatric Syndromes (NAPS)'" and "Human blood samples collected by Dr. Huey's research group as part of the project entitled 'Low-Dose Lithium for the Treatment of Behavioral Symptoms in Frontotemporal Dementia (Lithium in FTD).'"

374. NAPS is the study on which Plaintiff worked and on which the staffing arrangement described above occurred.

Exhibit A

MATERIAL

The following biological materials shall collectively be referred to as MATERIAL:

- Human plasma aliquots collected by Dr. Huey's research group as part of the project entitled "Neurodegeneration-Associated Psychiatric Syndromes (NAPS)."
- Human blood samples collected by Dr. Huey's research group as part of the project entitled "Low-Dose Lithium for the Treatment of Behavioral Symptoms in Frontotemporal Dementia (Lithium in FTD)."

a.

*EXHIBIT K. Exhibit A to the April 17, 2023 Simple Letter Agreement, identifying the transferred NAPS and Lithium in FTD materials.*

375. Separately, in March and April 2023, the National Institute on Aging and the National Institute of Neurological Disorders and Stroke, each a component of the National Institutes of Health within the United States Department of Health and Human Services, executed a Material Transfer Agreement for the Transfer of Human Materials for Research Purposes with Brown University and Butler Hospital.

376. That agreement identifies the parties as follows: "Brown University ('Brown'), and Butler Hospital ('Butler'), collectively ('Recipient')."

377. That agreement provides that "[t]he Human Material will be stored at Dr. Huey's lab space at Butler Hospital but will be used at both Brown and Butler in furtherance of Dr. Huey's ongoing projects."

378. That agreement further provides, at Paragraph 6, that "Recipient represents that it has obtained Institutional Review Board approval, as appropriate, to use Human Material."

379. Institutional Review Board management was among the core duties of Plaintiff's position, and among the duties Defendants redistributed to Mr. Stein and Mr. Manoochehri as alleged above.

**MATERIAL TRANSFER AGREEMENT**
**FOR THE TRANSFER OF HUMAN MATERIALS FOR RESEARCH PURPOSES**

This Human Material Transfer Agreement ("Agreement") is between the National Institute on Aging ("NIA") and the National Institute of Neurological Disorders and Stroke ("NINDS"), each part of the National Institutes of Health ("NIH"), a component of the United States Department of Health and Human Services ("HHS"), Brown University ("Brown"), and Butler Hospital ("Butler"), collectively ("Recipient") for the transfer of material isolated from individuals who have participated in clinical research (each a "Human Subject"), with or without accompanying data, to be used for research purposes as further defined below. NIA and NINDS together "Provider;" Brown and Butler together "Recipient;" each of the above may be referred to as a Party or collectively as Parties. This Agreement will become effective on the date of the last authorized signature below ("Effective Date").

Recipient and Provider agree as follows:

1. Provider will authorize Columbia University to transfer to Recipient the following: DNA samples taken from patients involved in a prior NINDS/NIA study under which Dr. Edward D. Huey, was one of the principal investigators and now Recipient Scientist, protocol #8l-N-0010, entitled "Evaluation of Patients with Frontotemporal Dementia, Corticobasal Syndrome, and Related Disorders" with any and all data generated by the protocol (collectively "Human Material"), said DNA samples and any and all data originally transferred from Provider to Columbia under an agreement (NINDS ref. 2012-0001; NIA ref. 34231-12; Columbia ref. 40773), effective 13 April 2012.

   The Human Material will be stored at Dr. Huey's lab space at Butler Hospital but will be used at both Brown and Butler in furtherance of Dr. Huey's ongoing projects, described below.

2. Descriptive title of RECIPIENT's research with Human Material is: to continue the

a. EXHIBIT L. Material Transfer Agreement for the Transfer of Human Materials for Research Purposes, National Institute on Aging and National Institute of Neurological Disorders and Stroke with Brown University and Butler Hospital, page 1.

380. That agreement was executed for Brown University by Jennifer Welch, Director of Research Agreements and Contracting, on March 30, 2023.

381. That agreement was executed for Butler Hospital by Stephen E. Burke, CPA, MBA, Vice President of Finance, on April 5, 2023, whose listed contact address on the signature page is OSPRaward@CareNE.org, an electronic mail address of Defendant Care New England.

382. That agreement was executed by Dr. Huey as Recipient Investigator on April 3, 2023, under the title "Director, Memory and Aging Program, Professor of Psychiatry and Human Behavior," at the address "345 Blackstone Blvd. 1st Floor Weld Building, Providence, RI 02906."

383. That address is Butler Hospital, a Care New England facility, and is the same location to which Brown's offer letters assigned Plaintiff.



**FOR PROVIDER:**

**NIA**

4/7/23
Luigi Ferrucci, Ph.D. Date
Scientific Director

4/7/23
Michael O'Donnell Date
Technology Development Coordinator

Mailing Address for Notices:
NIA c/o NCI Technology Transfer Center
9609 Medical Center Drive, MSC 9702
Bethesda, MD 20892-9702
Email: andrea.samari@nih.gov

**NINDS**

Digitally signed by Lauren B. Reoma -S
Date: 2023.04.05 15:23:24 -04'00'
Lauren Reoma, M.D. Date
Deputy Clinical Director

Susan E. Ano -S
2023.04.06 14:25:39 -04'00'
Susan Ano, Ph.D. Date
Director, OTT, NINDS

Mailing Address for Notices:
NINDS Office of Technology Transfer
31 Center Dr., Suite 8A52
Bethesda, MD 20892
Email: NINDS_TDC@mail.nih.gov

**FOR BROWN UNIVERSITY:**

DocuSigned by:
Jennifer Welch 03/30/2023 | 2:29 PM EDT
(Signature of Authorized Official) Date
Name: Jennifer Welch
Title: Director of Research Agreements and Contracting
Address: Attn: Director, Research Agreements and Contracting; 350 Eddy St. Box 1937; Providence, RI 02903
Phone: 401-863-9792
Email: ResearchContracts@brown.edu

**FOR BUTLER HOSPITAL:**

Stephen E. Burke 4/5/2023 | 6:50:51 AM PDT
(Signature of Authorized Official) Date
Name: Stephen E Burke, CPA, MBA
Title: Vice President, Finance
Address: 345 Blackstone Blvd., Providence, RI 02906
Phone:
Email: OSPRaward@CareNE.org

**Recipient Investigator:** I have read and understood the terms and conditions of this Agreement, and I will abide by them in the receipt and use of the Human Material.

DocuSigned by:
Edward Huey 04/03/2023 | 9:09 AM EDT
(Signature of Investigator) Date
Name: Edward Huey
Title: Director, Memory and Aging Program, Professor of Psychiatry and Human Behavior
Address: 345 Blackstone Blvd. 1st Floor Weld Building, Providence, RI 02906

a.

*EXHIBIT M. Signature page of the NIA/NINDS, Brown University and Butler Hospital Material Transfer Agreement.*

384. The foregoing establishes that Brown and Care New England jointly administered the research program in which Plaintiff worked; that they shared personnel, facilities and research materials in its operation; that a single individual acted for both institutions in the same transaction; that they coordinated their contractual and regulatory obligations through their respective institutional offices; and that the federal funding agency contracted with them together as a single Recipient.

385. Mr. Menard, a Care New England employee, exercised operational authority over MAP staffing, including Plaintiff's role, schedule and on-site presence requirements, as alleged above.

386. By reason of the foregoing, Brown, Lifespan and CNE constituted a joint and/or integrated employer of Plaintiff for purposes of the ADA, Title VII, FEPA, and RICRA.

387. On June 20, 2024, approximately one month after the May 2024 internal investigation, Brown and Lifespan publicly announced a major expansion of their affiliation, including Lifespan's rebranding as "Brown University Health."

388. Under that agreement Brown committed to a seven-year, $150 million investment in Lifespan, created ex officio positions on Lifespan's board of directors for Brown's president and the dean of its medical school, and made the Warren Alpert Medical School the exclusive medical school affiliate of Lifespan.

389. Each Defendant is a recipient of federal financial assistance.

390. Brown received federal financial assistance through NIH grant R01AG062268.

*Pretext and Discriminatory Animus*

391. Defendants' intent to discriminate against Plaintiff on account of her disability, perceived impairment, recorded impairment, sex, race, national origin and protected conduct is further established, in part, by conduct evidencing that Defendants' stated reasons for disciplining and terminating her were pretextual, including but not limited to the following:

a. Plaintiff was never subjected to performance scrutiny or discipline until after Defendants became aware of her disabilities and after she requested reasonable accommodation.
b. Plaintiff was never subjected to compliance scrutiny until after she reported the petty cash arrangement to Brown's finance office and opposed it directly to Mr. Stein and Mr. Menard.
c. Non-disabled comparators, including Mr. Stein and Mr. Manoochehri, were permitted to work remotely without restriction while Plaintiff's remote work accommodation was denied.
d. Plaintiff was required to be on site four days per week, more than any other coordinator or senior research staff member, during her documented medical recovery period.
e. Defendants' stated justification for Plaintiff's termination, a lack of funding, had no basis in fact: the grant funding her position remained active through May 31, 2025, the lab was actively recruiting research assistants, and lab management had been planning and budgeting for an additional research assistant since at least June 2024.
f. Defendants trained Plaintiff's replacement in Plaintiff's own duties throughout the period of escalating scrutiny, arranged physical workspace for her, and hired her into substantially the same role after terminating Plaintiff.
g. Defendants denied Plaintiff the use of a meeting-summarization tool they already possessed and were actively using for other meetings, and denied it specifically for the meetings whose content was later used to document her performance.
h. Defendants required Plaintiff to be on site four days per week notwithstanding that Brown's own approved accommodation plan provided for a default expectation of three.
i. Brown initiated a formal review of whether Plaintiff's accommodations were effective, Plaintiff completed her portion, and meetings to discuss resolutions were often rescheduled or delayed.
j. Defendants conducted repeated "performance expectation meetings" outside Brown's own standard Performance Improvement Plan process, with minimal notice, no recording accommodation.
k. Defendants failed to substantiate their claims regarding Plaintiff's performance with adequate contemporaneous documentation, while Brown's own lab records from the same period document Plaintiff's training and qualifications.
l. Defendants have a history of hostile working conditions in the same program: female nurse practitioners and other staff independently reported a hostile environment and workplace panic attacks, and Mr. Menard's employment was terminated following corroborated complaints.

m. Defendants structured the personnel changes that followed Plaintiff's corroborated complaints through interim Workday supervisory designations that obscured the nature of the corrective action taken.
n. Defendants reversed their asserted operational need for Plaintiff's on-site presence immediately before her termination, telling her she could work from anywhere, after months of denying that same accommodation as operationally impossible.
o. The temporal proximity of the adverse employment actions taken against Plaintiff in relation to her requests for reasonable accommodation, her reports of grant compliance irregularities, and her reports of a hostile work environment further supports an inference of discriminatory and retaliatory intent.

*Motivation and Harm*

392. Defendants' wrongful and unlawful acts and omissions, including but not limited to those described herein, violated the ADA, the Rehabilitation Act, Title VII, the False Claims Act, FEPA, CRPD, RICRA and the RIWPA, and were motivated by malice or ill will toward Plaintiff, and Defendants otherwise acted in bad faith and/or with reckless indifference to the statutorily protected rights of Plaintiff.

393. As a proximate result of Defendants' wrongful and unlawful acts and omissions, including but not limited to those described herein, Plaintiff suffered, is now suffering, and will continue to suffer economic and emotional injury, including but not limited to lost wages and benefits; lost retirement contributions; lost health insurance coverage during a period of intensive psychiatric treatment; unpaid and accrued vacation and paid time off; out-of-pocket costs for psychiatric and medical treatment and transportation; loss of earning capacity arising from sixteen months of documented unemployability; loss of career development opportunities, including mentorship, publication authorship and grant-writing experience on a multi-year federally funded research project; emotional pain and suffering; mental anguish; humiliation; loss of enjoyment of life; damage to her professional and personal reputation; and expenses for legal services.

## X. CAUSES OF ACTION

394. Plaintiff reasserts and re-alleges each and every allegation contained in paragraphs 1 through 393 of this Complaint in each of the counts below with the same force and effect as if set forth therein.

**Count One**
**Americans with Disabilities Act**
**42 U.S.C. § 12101, et seq.**
***Discrimination, Failure to Accommodate, Retaliation and Hostile Work Environment***
(Against All Defendants)

395. Defendants, by their acts and/or omissions, including but not limited to those described herein, engaged in unlawful discrimination on the basis of Plaintiff's disability in violation of the

ADA, and thereby deprived Plaintiff of rights secured under the ADA, causing Plaintiff to suffer damages as aforesaid.

**Count Two**
**Section 504 of the Rehabilitation Act of 1973**
**29 U.S.C. § 794**
***Discrimination, Failure to Accommodate and Retaliation***
(Against All Defendants)

396. Defendants, by their acts and/or omissions, including but not limited to those described herein, excluded Plaintiff from participation in, denied her the benefits of, and subjected her to discrimination within programs receiving federal financial assistance solely by reason of her disability, in violation of 29 U.S.C. § 794(a), causing Plaintiff to suffer damages as aforesaid.

**Count Three**
**Title VII of the Civil Rights Act of 1964**
**42 U.S.C. § 2000e, et seq.**
***Sex Discrimination, Retaliation and Hostile Work Environment***
(Against All Defendants)

397. Defendants, by their acts and/or omissions, including but not limited to those described herein, engaged in unlawful discrimination on the basis of Plaintiff's sex in violation of Title VII, and thereby deprived Plaintiff of rights secured under Title VII, causing Plaintiff to suffer damages as aforesaid.

**Count Four**
**Title VII of the Civil Rights Act of 1964**
**42 U.S.C. § 2000e, et seq.**
***Race and National Origin Discrimination, Retaliation and Hostile Work Environment***
(Against All Defendants)

398. Defendants, by their acts and/or omissions, including but not limited to those described herein, engaged in unlawful discrimination on the basis of Plaintiff's race and national origin in violation of Title VII, and thereby deprived Plaintiff of rights secured under Title VII, causing Plaintiff to suffer damages as aforesaid.

**Count Five**
**False Claims Act — Anti-Retaliation**
**31 U.S.C. § 3730(h)**
***Retaliation for Protected Activity***
**(Against All Defendants)**

399. Defendants, by their acts and/or omissions, including but not limited to those described herein, discharged and otherwise discriminated against Plaintiff in the terms and conditions of her employment because of lawful acts done by Plaintiff in furtherance of an action under the

False Claims Act and/or in efforts to stop one or more violations thereof, in violation of 31 U.S.C. § 3730(h), causing Plaintiff to suffer damages as aforesaid.

**Count Six**
**Rhode Island Whistleblowers' Protection Act**
**R.I. Gen. Laws § 28-50-1, et seq.**
***Retaliation for Protected Activity***
**(Against All Defendants)**

400. Defendants, by their acts and/or omissions, including but not limited to those described herein, retaliated against Plaintiff for reporting and/or refusing to participate in activity Plaintiff reasonably believed to be in violation of law, in violation of R.I. Gen. Laws § 28-50-3, causing Plaintiff to suffer damages as aforesaid.

**Count Seven**
**Rhode Island Fair Employment Practices Act**
**R.I. Gen. Laws § 28-5-1, et seq.**
**Discrimination, Failure to Accommodate and Retaliation**
**(Against All Defendants)**

401. Defendants, by their acts and/or omissions, including but not limited to those described herein, engaged in unlawful discrimination and retaliation on the basis of Plaintiff's disability, sex, race and national origin in violation of FEPA, and thereby deprived Plaintiff of rights secured under FEPA, causing Plaintiff to suffer damages as aforesaid.

***Count Eight***
***Rhode Island Civil Rights of People with Disabilities Act***
***R.I. Gen. Laws § 42-87-1, et seq.***
***Discrimination, Failure to Accommodate and Retaliation***
***(Against All Defendants)***

402. Defendants, by their acts and/or omissions, including but not limited to those described herein, engaged in unlawful discrimination on the basis of Plaintiff's disability in violation of the CRPD, and thereby deprived Plaintiff of rights secured under the CRPD, causing Plaintiff to suffer damages as aforesaid.

**Count Nine**
**Rhode Island Civil Rights Act of 1990**
**R.I. Gen. Laws § 42-112-1, et seq.**
***Discrimination, Failure to Accommodate and Retaliation***
**(Against All Defendants)**

403. Defendants, by their acts and/or omissions, including but not limited to those described herein, engaged in unlawful discrimination on the basis of Plaintiff's disability, sex, race and national origin in violation of the RICRA, and thereby wrongfully interfered with Plaintiff's contract of employment and her right to the full and equal benefit of all laws, causing Plaintiff to suffer damages as aforesaid.

**XI. PRAYERS FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that this Honorable Court grant the following relief:

1. A declaratory judgment declaring the acts and/or omissions of Defendants, including but not limited to those complained of herein, to be in violation of the ADA, the Rehabilitation Act, Title VII, the False Claims Act, the RIWPA, FEPA, and/or RICRA;
2. An injunction or other equitable relief directing Defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and not repeated, including the implementation of training on ADA compliance, crisis response protocols, retaliation prevention and accommodations procedures;
3. An injunction or other equitable relief including, but not limited to, an award of back pay, front pay or reinstatement, other compensation and/or benefits, and to make Plaintiff whole for all earnings and benefits Plaintiff would have received but for Defendants' unlawful conduct;
4. An order directing Defendants to correct Plaintiff's personnel and employment records and to expunge all discriminatory or retaliatory material therefrom;
5. An award of compensatory damages;
6. An award of punitive damages;
7. An award of liquidated damages;
8. All remedies available under 31 U.S.C. § 3730(h), including reinstatement, two times the amount of back pay, interest thereon, and compensation for special damages, litigation costs and reasonable attorneys' fees;
9. Reasonable accommodations during all litigation proceedings, including extended deadlines when medically necessary, written communication options, permission to appear remotely when clinically required, advance notice of hearings and deadlines, and breaks during proceedings as needed;
10. An award of prejudgment and post-judgment interest, reasonable attorneys' fees, litigation expenses and costs as authorized under 42 U.S.C. § 12205, 42 U.S.C. § 2000e-5(k), 29 U.S.C. § 794a, 31 U.S.C. § 3730(h), and R.I. Gen. Laws §§ 28-5-24, 28-50-3 and 42-112-2; and
11. Such other and further relief as this Court deems just and proper.

XII. DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all counts so triable.

Respectfully submitted,
Jane Doe,
Pro Se Plaintiff

**CERTIFICATE OF SERVICE**

I certify that 1:25-cv-00311-MSM-PAS Activity and Unredacted and Redacted Documentation has been electronically mailed to counsel of record:

Mitchell R. Edwards, Esq., counsel for Brown University
HINCKLEY, ALLEN & SNYDER
100 Westminster Street, Suite 1500
Providence, RI 02903
medwards@hinkleyallen.com

Matthew H. Parker, Esq. & Caroline R. Thibeault, Esq., counsel for Care New England Health System
WHELAN CORRENTE & FLANDERS LLP
100 Westminster Street, Suite 710
Providence, RI 02903
MParker@whelancorrente.com
cthibeault@whelancorrente.com

James A. Musgrave, Esq., counsel for Lifespan Corporation (Brown Health)
ROBERTS, CARROLL, FELDSTEIN & PEIRCE, INC.
Ten Weybosset Street, 8th Floor, Suite 800
Providence, RI 02903
jmusgrave@rcfp.com

Respectfully,
Jane Doe